Felicia Medina (CA 255804)
fmedina@sanfordheisler.com
Xinying Valerian (CA 254890)
xvalerian@sanfordheisler.com
**SANFORD HEISLER KIMPEL, LLP**
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 795-2024
Facsimile: (415) 795-2021

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE FRETTER and MARIA KORSGAARD, individually and on behalf of a class of similarly situated female employees,<br><br>Plaintiffs,<br><br>-- against --<br><br>BOSTON SCIENTIFIC NEUROMODULATION CORPORATION AND DOES 1- 10.<br><br>Defendant. | **CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Denise Fretter and Maria Korsgaard (collectively, "Plaintiffs" or "Class Representatives"), through their attorneys Sanford Heisler Kimpel, LLP, bring this nationwide class and collective action in their individual capacities and on behalf of female sales representatives to combat gender discrimination in employment. Defendant Boston Scientific Neuromodulation Corporation ("BSNC," the "Company" or "Defendant") discriminates against its female employees through: (a) discriminatory policies, practices and procedures in assignments, account/territory distribution, promotion and advancement; (b)

disparate pay and promotion; and (c) differential treatment.  Plaintiffs allege systematic violations of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), Title 42 U.S.C. 2000e, *et. seq.* ("Title VII").  Defendant also retaliates against women, such as Ms. Fretter and Ms. Korsgaard, who complain to Company leaders or HR about workplace discrimination.  Plaintiffs sue for declaratory and injunctive relief, back pay, front pay, compensatory, nominal and punitive damages, attorneys' fees, and costs.  Plaintiffs request a jury trial.

## INTRODUCTION

1.    Defendant Boston Scientific Neuromodulation's systematic, Company-wide discriminatory treatment of its female employees, results in substantial gender-based disparities in compensation and advancement.

2.    As a result of BSNC's uniform and common policies and practices, BSNC perpetuates unequal opportunities for female sales representatives. Specifically, compared to similarly qualified male sales employees performing substantially similar job duties, BSNC systematically:

        a.  Pays women lower base salaries;

        b.  Pays women less commissions;

        c.  Rewards women less for achieving comparable performance goals;

        d.  Assigns women to less profitable accounts and territories;

        e.  Assigns women more rigorous sales quotas; and

        f.  Promotes women slower and at lower rates.

3.    BSNC fosters a culture where male members of management are free to harass and denigrate women, with impunity.  Complaining to superiors about discrimination is widely known as committing "career suicide."  Female sales representatives in different regions across the country are subjected to similar forms of discriminatory treatment, ranging from blatant sexual advances to unfairly

taking away accounts or upping quotas – in other words, setting female sales representatives up for lower compensation, missing targets, harsher working conditions, and other barriers to achieving equal pay and promotion opportunities for equal work.

4.     The affected employees include Plaintiff Denise Fretter, who is currently employed at BSNC as a Regional Business Manager ("RBM") in Ohio, and Plaintiff Maria Korsgaard, who was employed at BSNC as a Territory Manager ("TM") in Nevada.

5.     BSNC is headquartered in Valencia, California and is a division of Boston Scientific Corporation.   Boston Scientific Corporation acquired the Neuromodulation division, formerly Advanced Bionics, in June 2007.   Upon information and belief, BSNC has continued to operate independently from Boston Scientific Corporation with separate management and human resources departments.

6.     BSNC specializes in the sale of devices that are implanted in patients' spinal columns to treat chronic pain.   BSNC has a national sales force of approximately 500 employees, who are responsible for selling the devices and educating patients and health care providers on the devices before and after they are implanted.

7.     Currently, BSNC's sales senior leadership consists of its President, a Vice President of Sales and a Director of Sales Operations.   None of these positions and predecessor positions has ever been filled by a woman.

8.     Directly beneath the senior leadership are six Area Vice Presidents ("AVPs," formerly known as Area Sales Directors, "ASDs") who are considered upper management.   The very first female AVP was promoted in late 2013 – well after the Company became aware of the allegations at issue in this complaint. Until that point, the AVP (and ASD) positions had been exclusively male.

9.     BSNC's centralized and predominantly male leadership team outlined

above, via common and uniform policies and practices, maintains control over nearly all aspects of sales representatives' employment, including compensation, promotions, performance evaluations, assignments, and terminations.

10.    AVPs oversee RBMs, such as Ms. Fretter.  RBMs are first-line managers and have TMs, such as Ms. Korsgaard, and Clinical Specialists ("CS"), who are entry-level employees, under them.  Formerly, Account Managers were included as a level in between Territory Managers and Clinical Specialists but have since been phased out into Territory Managers.

11.    Ms. Fretter was the first woman promoted to the RBM level, and she was the highest-ranking and sole woman in a management position until 2011.

12.    Only three out of twenty-six RBMs (11.5%) are women.  Former Vice President of U.S. Sales/National Director of Key Accounts Bobby Jenkins reinforced BSNC's male-dominated culture by referring to the RBMs as "the Boys" in emails, forgetting the few women who made it to the RBM level.



13.    Below RBMs are Territory Managers ("TMs").  Upon information and belief, only 28% of the TMs are women, but 55% of CSs, the level below TMs, are women.  As explained below, there is no legitimate business reason that women should be concentrated at the lowest rung of the Company.

14.     Territory and quota assignment policies, compensation policies, and promotions policies are developed and implemented at the Company's headquarters in Valencia, and at all times ultimate decision-making authority for assignments, compensations, promotions rests with employees in the AVP position or higher.  Employees below the AVP level have little to no authority to develop or implement BSNC policies.

**A. BSNC Assigns Female Sales Representatives to Lower Salaries and Positions than Male Sales Representatives.**

15.     BSNC systematically pays female sales representatives a lower base salary than male sales representatives.

16.     BSNC pays female employees lower starting salaries and lower position assignments than similarly situated male applicants.  Men are more frequently offered the starting position of Territory Manager while women are more frequently offered the starting position of entry level sales Clinical Specialist, despite female employees' substantially similar job qualifications.

17.     For example, Ms. Korsgaard applied to BSNC at the same time as one of her former male co-workers with a similar resume and similar experience, yet BSNC offered her a lower position and lower starting salary than it offered the male applicant.

18.     Ms. Fretter's base salary as an RBM has historically been lower than similarly situated male RBMs performing substantially similar job duties, even though Ms. Fretter's performance is at least on par with her male peers.

19.     Both Ms. Korsgaard and Ms. Fretter have experienced and observed BSNC systematically assigning women to lower positions and providing lower starting salaries than it does for similarly situated men.

**B. BSNC Pays Female Sales Representatives Less Commissions Than Male Sales Representatives.**

20.     BSNC compensates sales employees with a base salary, commissions

and bonuses.    Commissions and bonuses are a significant portion of total compensation.

21.    BSNC has followed uniform, systematically documented policies for distribution of accounts (also known as "territories") and quotas to sales representatives that have consistently disadvantaged women.  These policies allow for unfettered reliance on subjective, unvalidated criteria for assigning accounts and quotas.    The implementation of BSNC's policies lead to female sales representatives ending up with lower commission rates than male sales representatives.

22.    Each sales representative's commissions are driven by revenue performance as well as quota performance.  Revenue performance is a function of the territory assigned to the sales representative.  Quota performance measures the percent to sales goal (quota) achieved by the employee in his or her territory.

23.    Through the levers of territory assignments and quota assignments common policies, BSNC effectively determines commission rates through an entirely subjective system.

24.    Upper management at BSNC assigns employees to a particular "territory," which is a list of doctors rather than a prescribed geographic area.  In effect, a territory is a list of accounts.  BSNC does not credit employees for sales made outside of their BSNC-assigned territory, so assigning employees to smaller, less profitable territories restricts the amount of sales the employee is able to generate and thus compensation they can receive.

25.    BSNC directs and permits assignment and reassignment of accounts without safeguards to ensure that the assignments and reassignments are fair and even-handed.

26.    Employees whom BSNC assigns to more lucrative territories are assigned to "commission tiers" with higher "commission" rates than employees BSNC assigns to territories with lower overall revenue potential.

27.   Upper management assigns a sales goal (or quota) to that employee for the territory.  Assigning lower quotas to an employee makes it easier for that employee to meet or exceed quotas; the inverse is also true.

28.   RBMs, TMs, Clinical Specialists and Account Managers are each subject to different commission tiers that are a product of their sales revenue.

29.   For example, in 2012, TMs assigned territories generating $800,000 in sales revenue (commission tier "Atlas") were able to earn a commission of 6.5% upon meeting their sales quota. In contrast, TMs assigned territories generating $200,000 in sales revenue (commission tier "Emerging") were only able to earn a commission of 3% upon meeting their sales quota. Furthermore, TMs assigned to territories in the initial "Atlas" commission tier were able to earn a commission rate of 3.75% without coming close to meeting their quota.

30.   In other words, a woman who exceeded 100% of her sales quota may nonetheless have been assigned to a lower commission rate than a man who approached but does not meet 100% of his sales quota.

31.   As a result of the unvalidated and subjective criteria by which accounts and quotas are assigned, male employees are rewarded more generously than women for achieving comparable performance results and demonstrating comparable productivity.

32.   BSNC's uniform company-wide policies and practices for assigning accounts and determining quotas are not based on predetermined, objective criteria for measuring sales representatives' merit or productivity.   The resulting commissions compensation system is therefore not a bona fide merit or production system.   The compensation and account distribution systems are not adequately communicated to employees and are not consistently and even-handedly applied. Upon information and belief, BSNC had never assigned a female employee to the highest commission tier prior to 2013.

33.   Upon information and belief, the Company continues to discriminate

against female employees with respect to territory and quota assignments and female sales representatives continue to commission at lower rates than their male comparators.  In other words, BSNC upper management continues to maintain a system of gender-stratified commission compensation.

34.   Through its policies and practices of assigning female sales representatives to less profitable territories, to higher quotas and to lower commission tiers, BSNC caused gender-based disparities in compensation.

35.   Additionally, defendants intentionally discriminated in implementing these policies.

**C. BSNC Assigns Female Sales Representatives to Less Profitable Territories than Male Sales Representatives.**

36.   BSNC upper management assigns female sales representatives, regardless of their performance or qualifications, to less profitable territories (or accounts or doctor lists as described above).  In addition, BSNC will reassign lucrative territories from female representatives to male representatives.

37.   For example, in 2010, BSNC hired a man and assured him that he could take over a profitable portion of Ms. Korsgaard's territory.  BSNC then took that portion of Ms. Korsgaard's territory from her and gave it to the man.

38.   In so doing, BSNC discriminatorily decreased Ms. Korsgaard's compensation.

39.   Both Ms. Korsgaard and Ms. Fretter experienced and observed BSNC systematically assigning women to less profitable territories.

**D. BSNC Assigns Lower Quotas to Male Sales Representatives than Female Sales Representatives.**

39.   BSNC's upper management also regularly assigns lower quotas to male sales representatives than to female sales representatives.  As a result, male employees are more likely to meet their quotas and commission at higher rates.

40.   For example, when BSNC assigned part of Ms. Korsgaard's territories

to a male TM in 2012, the Company assigned him a much lower quota than it assigned Ms. Korsgaard when she covered the same territory.  Meanwhile, BSNC expected Ms. Korsgaard to meet a quota that far exceeded previous sales in the territory.

41.     In so doing, BSNC discriminatorily decreased Ms. Korsgaard's compensation.

42.     Both Ms. Korsgaard and Ms. Fretter have experienced and observed BSNC systematically assigning women to more rigorous quotas than those assigned to similarly situated men performing substantially similar job duties.

## E. BSNC Rewards Women Less When It Comes to Other Measures of Incentive Compensation

43.     Male sales representatives receive more compensation in the forms of raises, quarterly bonuses, commissions bonuses and stock options as a result of BSNC's uniform, documented, and unvalidated procedures for determining these forms of compensation. BSNC relies on subjective criteria as well as tainted variables, such as, but not limited to, revenue performance to determine such compensation, resulting in systematic gender-based disparities.

44.     Both Ms. Korsgaard and Ms. Fretter have experienced and observed BSNC systematically rewarding women less than it has rewarded men for performing substantially the same job and achieving comparable productivity.

45.     BSNC systematically awards smaller raises to women than it does to men.

46.     For example, BSNC denies female TMs pay raises it grants to male TMs performing substantially the same job duties.

47.     Additionally, prior to March 2014, BSNC did not complete performance evaluations for its employees, hindering their ability to challenge the Company's decisions.

48.     Furthermore, BSNC upper management denies female employees

other forms of compensation.

49. BSNC employees are eligible for quarterly bonuses. Specifically, RBMs can earn quarterly and annual bonuses for reaching or exceeding their quotas. Both TMs and RBMs can also earn additional bonuses based on improvements in sales margin management and sales compliance.

50. BSNC employees are eligible for commission bonuses, which are referred to as "MBOs" ("Management by Objective"). The MBOs change every year and are discriminatorily suppressed for women as a result of BSNC upper management's discrimination in assigning territories. For example, in FY2014, the MBO metric was profit margin. Consequently, sales representatives assigned to high revenue generating territories (disproportionately male) have more leeway to spend and stimulate profit and Sales Representatives assigned to low revenue generating territories (disproportionately female) have to spend less in order to obtain the target profit margin.

51. BSNC also awards RBMs quarterly stock options, which allow them to buy shares in the Company's stock. BSNC upper management decides who receives bonuses and stock options and denies bonuses and stock options to female employees or gives lower bonuses and stock options to female employees than male employees. For example, in 2011, Ms. Fretter surpassed her quota expectations and performed better than her male colleagues performing substantially the same work, but BSNC awarded her fewer bonuses and stock options.

52. BSNC's compensation system for commissions bonuses, stock options and raises are not bona fide merit or production systems because they are unvalidated, do not have consistently applied, objective criteria for measuring merit or productivity, and are not adequately communicated to employees.

53. In sum, BSNC's compensation and account distribution systems on the whole are not merit or production based, but rather are governed by tainted,

unfair, and discriminatory criteria.  Specifically, they are not validated, do not have predetermined criteria for measuring merit or productivity, they are not adequately communicated to employees, and they are not consistently and/or even-handedly applied.

54.     BSNC's compensation and account distribution system are not justified by business necessity because they do not compensate sales representatives based on actual measure of performance.

55.     By using the tainted variables as a criterion for compensation and promotion, BSNC further perpetuate the gender-based compensation disparities and create a cumulative advantage for male sales representatives based on systematically documented and unvalidated criteria that has an adverse impact on female sales representatives.

## F. BSNC Denied Women Equal Opportunities for Promotion and Advancement.

56.     BSNC caused gender-based disparities in promotions by using uniform, unvalidated and unfair procedures and common policies for selecting employees for promotions.

57.     BSNC's promotions system is not based on objective measures of merit and productivity but based on forced rankings or primarily subjective criteria set by the Company.   Thus, promotions decisions were driven by subjective evaluations made by a small number of senior managers without safeguards to ensure that the process and the criteria were fair and reliable.  Upon information and belief, this system is companywide and uniform.

58.     Furthermore, BSNC allows deviations from formal evaluation and promotions processes that have an adverse impact on female sales representatives' promotions.  Upper management routinely promotes employees within a "tap-on-the-shoulder" policy in which upper management does not post job openings and awards promotions on personal relationships rather than qualifications.

59.     As a result of its uniform, systematically documented but unvalidated policies and procedures for promotions, BSNC tends not to promote women beyond entry-level management in sales and BSNC promotes male employees faster than female employees.  Until the fall of 2013, no woman held a position in upper management at the AVP level or higher.

60.     For example, in 2012, the Company promoted four male RBMs to AVP without posting the position or informing female RBMs they could apply.

61.     While Ms. Fretter was qualified for the position, BSNC promoted the male applicants instead, even though she had more experience at BSNC than two of the men and comparable experience as the other two.  One male applicant did not meet the position's qualifications of having a college degree.

62.     Similarly, when BSNC interviewed Ms. Korsgaard for a posted RBM position in March 2012, she later learned that her "interview" happened after BSNC had already held final interviews for the position at BSNC headquarters. BSNC upper management instead hired a male co-worker who was ranked 82nd in the nation for sales performance, while Ms. Korsgaard was ranked 6th.

63.     BSNC also denies other promotional and developmental opportunities to women.  An example is the selection process for the Presidents' Club Award. Each year, the Company gives out the prestigious President's Club Award to the top performing RBMs and TMs.  The winners of this award receive both the Company-wide recognition and the opportunity to go on an exclusive President's Club retreat.  This experience makes future promotions more likely and otherwise provides important development and networking opportunities.

64.     In 2010, although Ms. Fretter was qualified for the annual President's Club Award, BSNC upper management denied her the Award, and instead gave it to a male employee who had numerous compliance violations and whose tenure and sales growth were less than Ms. Fretter's.  Upon information and belief, BSNC management tampered with the President's Club scoring matrix in 2010 in order to

ensure that Ms. Fretter was not selected. Despite exemplary performance, Ms. Fretter did not receive President's Club until 2013, after the Company's upper management became aware of the prospect of a gender discrimination class action against them.

### G. BSNC Fosters a Work Environment that is Hostile to Female Employees.

65. BSNC management also fosters a "good old boys' club" atmosphere that is hostile to the success and advancement of female employees, regardless of their qualifications or merits. Upper management fuels a culture of heavy drinking and late night parties, especially at its national sales meetings.

66. For example, at a national sales meeting in San Diego, California, the Company invited managers to a dinner and wine tasting. Many of the male employees in upper management became so intoxicated that they yelled obscenities at the event staff and passed out on couches during the event.

67. BSNC President Michael Onuscheck and Vice President of Sales Allen Meacham, among other leaders, were present and witnessed this behavior but took no action to prevent it.

68. Male managers also subject women to verbal and physical sexual harassment. For example, RBM Jim Leavitt ("RBM Leavitt") stuck his hands down Ms. Fretter's pants and made taunting remarks about her underwear. One woman, Jennifer Geraci, was told during her business review that she needed to stop being perceived as just "one of the chicks" and was asked whether she planned on having a family.

69. Both Ms. Korsgaard and Ms. Fretter have experienced and observed BSNC systematically subjecting women to sexist and hostile behavior.

### H. BSNC Discourages Women From Complaining and Retaliates Against Those Who Do.

70. Women at BSNC are told that complaining of discrimination at BSNC

---

is "career suicide." BSNC is thus allowed to continue discriminating, safe in the knowledge that women are unlikely to complain.

71. When women do raise complaints, despite BSNC' discouragement, BSNC retaliates against them.

72. For example, when Ms. Fretter raised allegations of gender discrimination in 2012, BSNC further decreased her territory and diminished her ability to make sales.

73. Despite knowledge of gender discrimination complaints, BSNC did not act and did not protect complainants against retaliation. BSNC effectively condoned discrimination.

## JURISDICTION AND VENUE

74. This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331.

75. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because unlawful employment practices occurred in California and BSNC is headquartered in Valencia in Los Angeles County.

76. Plaintiffs and Defendants entered into a tolling agreement to toll the individual and class claims of Plaintiffs on December 10, 2012. The parties' tolling agreement provided that Plaintiffs' claims would be tolled until either party gave notice terminating the tolling agreement. Plaintiffs' counsel notified BSNC on November 15, 2013, that they were terminating the agreement.

77. Plaintiffs timely filed individual and class charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on November 22, 2013.

78. The EEOC issued right to sue letters on December 18, 2014.

## PARTIES

79. From September 2004 to the present, **Plaintiff Denise Fretter** was a

14

female "employee" at BSNC, as defined by Title VII.  From September 2004 to the present, Ms. Fretter lived and worked in Ohio.

80.     From April 2008 to June 2012, **Plaintiff Maria Korsgaard** was a female "employee" at BSNC, as defined by Title VII.  From April 2008 to June 2012, Ms. Korsgaard lived in Nevada and worked in Nevada and Utah.

81.     Plaintiffs Fretter and Korsgaard each signed a Consent to Join the Equal Pay Act collective action.  Their Consents to Join are attached as Exhibit A.

82.     At all times relevant to this action, **Defendant Boston Scientific Neuromodulation Corporation** is and has been headquartered in Valencia, California and has its principal place of business there.   Boston Scientific Neuromodulation is a division of parent Company Boston Scientific Corporation.

## FACTUAL ALLEGATIONS

### A. <u>Denise Fretter</u>

83.     As an RBM, Ms. Fretter is responsible for developing and implementing plans to generate and increase sales of BSNC' medical devices.  She is assigned between fifteen and twenty-one direct reports at any given time, all of whom are TMs and Clinical Specialists.

84.     Ms. Fretter began her employment with BSNC in September 2004.

85.     In January 2007, Ms. Fretter became the first woman promoted to RBM.  Since her promotion to RBM, Ms. Fretter has reported directly to AVPs Michael McIntyre, Blake Carver, and Michael Cronin ("AVP Cronin").

86.     Ms. Fretter consistently ranks among the top ten RBMs nationwide in sales performance.  Upon information and belief, she has ranked among the top ten sales employees for the majority of her time at the Company but has repeatedly been denied President's Club honors.

87.     In 2009 and 2011, she increased her sales by more than 20%, far above the Company average.  In 2010, she grew her sales by more than 40% from the previous years.  In 2012, her sales for two particular products were among the

highest in the nation.

88.  Ms. Fretter was the top-performing RBM in the nation in 2013.  As a result of her outstanding performance, Ms. Fretter won U.S. Region of the Year, RBM of the year, received the President's Club Award, and was nominated to the Regional Business Manager Council for 2014, a leadership position bestowed on ten or eleven of the highest-performing and tenured RBMs.

89.  Ms. Fretter's exemplary sales performance continued in 2014. Despite the addition of a large, unprofitable territory to her region, Ms. Fretter exceeded all of her sales quotas and was once again nominated for the Regional Business Manager Council.  However, Ms. Fretter did not win President's Club in 2014, a fact that can be attributed to the underperforming territory that the Company saddled her with.

90.  Despite her skills and qualifications, BSNC upper management has paid Ms. Fretter less than similarly situated male employees, assigned her to less profitable territories, denied her monetary awards, denied her promotional opportunities, subjected her to sexual harassment and a hostile work environment, and retaliated against her.

### i.   BSNC Paid Ms. Fretter Less Than Similarly Situated Male Employees.

91.  Despite her exemplary performance, BSNC has paid Ms. Fretter less than similarly situated men performing substantially the same work by giving her a lower base salary and making it more difficult for her to receive higher commission.

92.  Ms. Fretter's base salary as an RBM is lower than similarly situated male RBMs performing substantially the same work.

93.  Additionally, as a result of its territory assignment policy, BSNC paid a similarly situated male RBM approximately $17,000 more commission in 2011, even though Ms. Fretter started at BSNC about the same time he did, her

performance was superior, and they performed substantially the same work.

94.     BSNC also denied Ms. Fretter monetary awards.  While Ms. Fretter surpassed her quota expectations and performed better than her male colleagues in 2011, BSNC awarded her a smaller bonus and stock payout than comparably situated male employees.

### ii.    BSNC Assigned Ms. Fretter to Less Profitable Territories.

95.     BSNC repeatedly has eliminated profitable portions of Ms. Fretter's territory.

96.     For example, in 2011, BSNC upper management transferred the entire state of Michigan, which was highly profitable, from Ms. Fretter to a less-tenured male RBM, Jeff Klunke.

97.     As detailed further below, BSNC upper management removed several revenue-generating doctors from Ms. Fretter's territory in 2012, despite increasing her sales quota by 30% each year.

98.     Furthermore, in 2013, BSNC upper management divided a former RBM's region by saddling Ms. Fretter with the large, unprofitable Detroit territories and delegating the remaining, more profitable sections of the region to a white male RBM.

99.     As a result of this unwanted addition, Ms. Fretter's did not win President's Club for 2014, though she almost certainly would have had the Detroit territories not been taken into account.  Meanwhile, the white male RBM who received the profitable portions of the region won President's Club and RBM of the year in 2014, even though he had less than one year of RBM experience.

100.    Despite the obstacles that BSNC presents by assigning her to less profitable territories and setting her to a very high quota, Ms. Fretter remains extremely successful and is currently one of the Company's top five revenue producers in the country.

       **iii.   BSNC   Denied   Ms.   Fretter   a   Promotion   and   Other Advancement Opportunities in Favor of Less-Qualified Male Employees.**

101.  In the spring of 2012, BSNC promoted four male RBMs to AVP without posting the position or informing Ms. Fretter or other female RBMs they could apply.

102.  BSNC promoted the male employees even though Ms. Fretter was at least as qualified. She had at least as much experience at BSNC than all of them and more experience than two of them.  Additionally, Ms. Fretter has a college degree, one of the requirements for the AVP position, while at least one of the men promoted does not.

103.  BSNC also promoted the male employees even though Ms. Fretter had regularly informed her managers that she was interested in higher management positions within the Company and was interested in taking on additional responsibilities.

104.  BSNC denied Ms. Fretter the President's Club Award in February 2010, and instead awarded it to a male employee who had numerous compliance violations, which should have disqualified him from the contest.  Ms. Fretter should have received the award, given that she had increased her annual sales by more than 50% and she ranked in the top four sales representatives for her sales performance in the nation.

105.  BSNC also denied Ms. Fretter the President's Club Award in February 2011, instead awarding it to less qualified male employees Mr. Galbraith and Mr. Klunke.

106.  AVP Carver and AVP Cronin also excluded Ms. Fretter from membership in BSNC' RBM Council, granting this promotional opportunity to her lower-performing and less-tenured male colleagues.  Members of this board are asked to meet three to four times a year with upper management to discuss

important sales topics and prepare for national conferences.   BSNC upper management selects certain RBMs for membership in the RBM Council based not on performance, but social connections established through the Company's boys' club network.   Ms. Fretter was not asked to serve on this council until 2014, after the Company's upper management became aware of the legal proceedings against them.

107.   Ms. Fretter and other female employees are hindered in advocating for higher pay and promotional opportunities due to BSNC's failure to complete performance reviews for their employees.   BSNC continues to promote employees through its "tap-on-the-shoulder" policy that values exclusionary male social networks over merit.

### iv.   BSNC Subjected Ms. Fretter to Sexual Harassment and a Hostile Work Environment.

108.   BSNC fosters a boys' club atmosphere that is hostile to women and encourages male employees to act with impunity.

109.   Ms. Fretter suffered sexual harassment from a superior.   For example, RBM Leavitt shoved his hands down Ms. Fretter's pants and made taunting and humiliating remarks about her underwear.

110.   Leavitt also publicly harassed her at a national sales meeting, telling her "Your ass looks great in the dress."

111.   At that same national sales meeting, the Company invited its managers to a wine tasting event in which many of the male leaders became so intoxicated that they yelled obscenities at the event staff and passed out during the event.   Other members of BSNC upper management, including President Onuscheck and VP of Sales Meacham, witnessed this behavior but failed to take any action in response.

112.   BSNC subjects women to stricter scrutiny than it does men based on gender stereotypes.   BSNC fails to reprimand male employees for their

inappropriate behavior, even though it reprimands female employees who become intoxicated at Company events, cautioning them against being "inappropriate."

113. BSNC tolerates grossly inappropriate behavior from its male employees. For example, RBM Leavitt routinely made unwanted and inappropriate comments in the workplace, about, for example, sex toys, sexual positions, and his sexual activities.

### v.   BSNC Retaliated Against Ms. Fretter.

114. After Ms. Fretter hired counsel and threatened to institute class-wide litigation against the Company for gender discrimination, BSNC took action to further decrease her compensation.

115. For example, in 2012, BSNC upper management contacted Ms. Fretter's client without her knowledge or involvement and directed him to postpone scheduled medical procedures until after the New Year. This caused Ms. Fretter to lose approximately $300,000 in revenue for 2012 and lowered her bonus by at least $10,000.

116. VP Jenkins and AVP Cronin then stripped a significant number of doctors from Ms. Fretter's territory, instead assigning them to a lower-performing male employee.

117. Male employees in upper management, including AVP Cronin, also began excluding Ms. Fretter from important communications. In October 2012, for example, AVP Cronin emailed a male Territory Manager, one of Ms. Fretter's subordinates, about promising clients in Ms. Fretter's territory. AVP Cronin failed to include Ms. Fretter in the communication. AVP Cronin includes all male employees in communications regarding potential clients in their territories.

118. Around the same time, Ms. Fretter also walked in on AVP Cronin telling a male subordinate on her team that Ms. Fretter would not be allowed to promote female Account Manager Karin Sill to Territory Manager. Not only did AVP Cronin discuss confidential employee information to a male subordinate, but

it was also information that he had not yet disclosed to Ms. Fretter.  It was Companywide policy to promote applicable AMs to TMs in order to do away with the AM position.

119.   Additionally, after Ms. Fretter informed AVP Cronin that he was involved in a serious miscommunication that threatened BSNC's relationship with a long-standing client, AVP Cronin referred to Ms. Fretter as "overly emotional."

120.   In December 2013, BSNC upper management divided up a former RBM's region by assigning Ms. Fretter the Detroit market and delegating the remainder of Michigan and the Chicago territory to a recently promoted male RBM, Matt Zubel.  While the Chicago and surrounding Michigan territory was lucrative, Detroit was a failing market with severely depressed sales numbers.  Ms. Fretter was never consulted about this decision or given the option to take on the Michigan or Chicago territories.  When she informed AVP Cronin that she did not want the Detroit territories and expressed concerns about the impact this new addition could have on her region's performance, AVP Cronin assured her that the market would not require much rebuilding.

121.   It soon became obvious that in fact the Detroit territories were seriously challenged, with the market running approximately $2.5 million below quota for the year.  Although Ms. Fretter's original sales team achieved 102% of its sales goals and brought in $23 million – one of the highest revenues in the country, the Detroit territory dragged the entire region's numbers down to only 98.5% of quota.   Meanwhile, RBM Zubel replaced Ms. Fretter as the top-performing RBM in the country, while Ms. Fretter has dropped to twelfth in the rankings.

122.   Though Ms. Fretter successfully petitioned to have her compensation plan adjusted to account for Detroit's effect on her region, VP of Sales Allen Meacham told Ms. Fretter that the Company was unwilling to discount the impact of the Detroit region when calculating the standing for the 2014 President's Club

award.  As a result, Ms. Fretter did not win President's Club for 2014.

123.  Ms. Fretter experienced and continues to experience emotional distress and other forms of pain and suffering.

**B.     Maria Korsgaard**

124.  Ms. Korsgaard is a former employee of BSNC.  At the time of her separation in June 2012, she was a TM assigned to BSNC's Nevada Territory.

125.  Ms. Korsgaard began her employment with BSNC in April 2008 as a Clinical Sales Representative.   In the fall of 2008, BSNC promoted to her to an Account Manager position.  In early 2010, BSNC promoted Ms. Korsgaard to Territory Manager.  She reported to RBM Galbraith until he was promoted to AVP in March 2012, at which time she began reporting to RBM Josh Leder.

126.  Ms. Korsgaard demonstrated exceptional performance as a Territory Manager.  She earned the President's Club Award in 2011, and in February 2012, she finished sixth in the nation among all Territory Managers for her sales performance.

127.  Despite her skills and qualifications, BSNC upper management paid Ms. Korsgaard less than similarly situated male employees performing substantially the same work, reassigned her profitable territory to a less-qualified male employee, set her quotas higher than her male counterparts, denied her a promotion in favor of a less-qualified male, and subjected her to a hostile work environment.  As a result of BSNC' discriminatory treatment, Ms. Korsgaard was left with no choice but to resign on June 1, 2012 due to denial of "pay, promotion, and professional opportunities as a result of [her] gender."

**i.     BSNC Paid Ms. Korsgaard Less than Similarly Situated Male Employees Performing substantially the Same Work.**

128.  When Ms. Korsgaard applied to work at BSNC, the Company offered her a lower starting salary and a lower position than a similarly situated male applicant who applied for the same job opening, even though the two had nearly

identical experiences and qualifications.  They both worked at Novartis for the same number of years and left their employment there at the same time. Additionally, the BSNC employee who interviewed Ms. Korsgaard explicitly told her she was "overqualified" for the entry level position BSNC offered her.

129.   While BSNC offered Ms. Korsgaard a starting base salary of $40,000, BSNC offered the male candidate a starting base salary of $55,000, plus a $20,000 bonus.

130.   When BSNC promoted Ms. Korsgaard to Territory Manager in January 2010, BSNC continued to pay her a lower base salary than similarly situated male Territory Managers.  While BSNC paid male TMs including new hires salaries of up to $85,000, BSNC paid Ms. Korsgaard only $65,000.

131.   BSNC also prevented her from commissioning for the first quarter of 2010, even though BSNC allowed her male counterparts to commission immediately upon promotion.

### ii.   BSNC Hired a Less-Qualified Male Employee to Take Over Ms. Korsgaard's Territory.

132.   Ms. Korsgaard's territory consisted of both Utah and Las Vegas, Nevada, though Utah comprised the vast majority of her business and clientele.  In the summer of 2010, RBM Galbraith approached Ms. Korsgaard and suggested that she hire someone to help her with Utah.  RBM Galbraith then sent her the names of three candidates he wanted her to consider.

133.   Ms. Korsgaard identified the most qualified candidate and recommended that RBM Galbraith and his manager, AVP Hap Peterson ("AVP Peterson"), hire that individual.  However, management rejected her recommendation and instead hired Rex Doman, who was unqualified for the position.  Mr. Doman received his college degree in a field unrelated to sales or medicine and he had no sales experience.

134.   Upon starting work, Mr. Doman told Ms. Korsgaard that RBM

Galbraith had promised him Ms. Korsgaard's Utah territory during the interview.

135.   Although Mr. Doman was lower in the sales hierarchy than Ms. Korsgaard, he disregarded Ms. Korsgaard's instructions and disrespected her in front of clients, telling them that she was performing poorly.  He regularly ignored Ms. Korsgaard's explicit instructions and failed to communicate with her, instead communicating directly with RBM Galbraith.

136.   Despite Ms. Korsgaard's numerous complaints to RBM Galbraith about Mr. Doman's unprofessional behavior, insubordination, and attempts to sabotage Ms. Korsgaard's relationships with clients, RBM Galbraith and AVP Peterson refused to discipline Mr. Doman or grant Ms. Korsgaard permission to do so.

137.   In 2012, the Company promoted Mr. Doman to Territory Manager. At that time, the Company assigned him the Utah Territory – taking away from Ms. Korsgaard, the more senior TM, the most lucrative part of her business and clientele.

138.   Unlike when Ms. Korsgaard was promoted, BSNC allowed Mr. Doman to begin commissioning immediately.

139.   BSNC assigned Mr. Doman a quota that was over $100,000 less than Ms. Korsgaard's quota had been the prior year, despite the fact that Utah had comprised the vast majority of Ms. Korsgaard's business and clientele.  In contrast, Ms. Korsgaard's quota stayed essentially the same and she was expected to meet the same quota even though she was left with only the Las Vegas territory.

140.   Ms. Korsgaard was unable to meet the quota with her Las Vegas territory.  After she ended up leaving the Company, they did not hire another person to take over her Las Vegas territory, demonstrating that there was not enough business in that territory to support a sales representative.

141.   BSNC's decision to strip the Utah territory from Ms. Korsgaard decreased her compensation significantly.  When Ms. Korsgaard managed the Utah

territory in 2011, she received quarterly commission checks ranging from $36,000 to $42,000.  However, in the first quarter of 2012, her first quarter without the Utah territory, her commission checks totaled approximately $5,000 or less.

### iii.  BSNC Denied Ms. Korsgaard a Promotion and Other Advancement Opportunities in Favor of Less-Qualified Male Employees.

142.  In 2012, Ms. Korsgaard told RBM Galbraith that she wanted to be considered for the recently posted RBM position.  RBM Galbraith told Ms. Korsgaard that he did not know the criteria for the position and was "surprised" to learn she was interested, even though she had repeatedly told him she wanted to advance.

143.  BSNC then scheduled an "initial interview" with Ms. Korsgaard. However, Ms. Korsgaard later learned that her "initial interview" took place after BSNC had already conducted final interviews in Valencia, California with two lower-performing male Territory Managers.

144.  BSNC did not give Ms. Korsgaard a final interview, even though she ranked 6th in the nation in 2011, the year before, in sales performance.  BSNC instead promoted one of the male candidates it had interviewed earlier, who was less well qualified and who ranked 82nd in the nation (compared to Ms. Korsgaard's 6th place ranking).

### iv.  BSNC Constructively Discharged Ms. Korsgaard.

145.  Despite this discriminatory treatment, Ms. Korsgaard did not believe she could complain of discrimination, as she was warned by her manager that "to complain is career suicide" and would otherwise do no good and may harm her career in the insular medical device community for a longer term.

146.  In the face of such intolerable and discriminatory conditions and with no hope of improvement or change, Ms. Korsgaard was forced to leave the Company in June 2012.

147.  As a result of BSNC's discrimination, Ms. Korsgaard experienced emotional distress and other forms of pain and suffering.

## CLASS ACTION ALLEGATIONS

### A. General Facts Relevant To Class Claims And Class Definition

148.  Class Representatives Fretter and Korsgaard seek to maintain claims on behalf of themselves and on behalf of a class of current, former, and future female sales employees in a sales representative role, at the Regional Business Manager level or below, including, without limitation, Territory Manager, Clinical Specialist, and Account Manager, who worked at any time in Defendant's sales organization in the United States during the applicable liability period to the date of judgment.

149.  The **Title VII Class** consists of all female sales employees as described above, who are, have been, or will be employed by Defendant in the United States at any time during the applicable liability period, including until the date of judgment in this case.  Upon information and belief, there are over 200 such employees in the proposed class.

150.  The Class Representatives seek to represent all of the female sales employees described above.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

151.  BSNC's uniform company-wide common policies and practices have subjected female employees to continuing unlawful disparate treatment and have had a continuing, unlawful disparate impact on them and their employment opportunities.  Such gender discrimination includes (a) assigning female employees to smaller and less profitable territories; (b) assigning higher quotas to female employees in order to make it more difficult for them to reach commission; (c) paying female employees less than their male counterparts; (d) placing women into lower positions than similarly situated male applicants; (e) creation of a hostile work environment; (f) failing to prevent, respond to, adequately investigate and/or

appropriately resolve instances of gender discrimination in the workplace; and (g) otherwise subjecting female employees to disparate treatment with respect to the terms and conditions of their employment through, but not limited to, exposure to gender-based (pay and promotion) discrimination, sexual harassment and a hostile work environment with no avenues for recourse.  This gender discrimination also involves retaliation against female employees who have complained of wage disparity, gender discrimination and sexual harassment through internal reporting channels, the filing of EEOC complaints, and hiring counsel, including by assigning them less profitable territories, giving them to unreasonable or higher quotas, subjecting them to increased scrutiny or otherwise altering their terms and conditions of employment.

152.  The discriminatory nature of BSNC's policies and practice is exacerbated by the fact that men greatly outnumber women in the upper management positions at BSNC, as detailed above

153.  BSNC's compensation, development, promotion, advancement, award, training and performance evaluation policies, practices and procedures incorporate the following discriminatory practices: (a) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce or eliminate disparate impact and/or intentional biases or stereotypes and (b) refusing or failing to provide clear and equally opportune standards for promotions and awards.

154.  BSNC, in effect, bars female employees from better and higher-paying positions that have traditionally been held by male employees.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, BSNC's assignment, development, promotion, advancement, training, compensation and performance evaluation policies, practices and procedures.

155.  These policies, practices and procedures all suffer from a lack of:

transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage, develop or reward employees.

156. Where HR complaints and compliance policies exist, they lack meaningful quality controls, standards, implementation metrics and means of redress, such that upper management and HR may ignore, disregard, minimize, cover up, mishandle or otherwise fail to respond properly to evidence of discrimination in the workplace. There is no meaningful separation between complaint reporting channels and the managers who create discriminatory or hostile working conditions for women, such that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether.

157. BSNC tolerates and cultivates a hostile environment in which employees are routinely and openly devalued and where retaliation for voicing complaints of gender discrimination is the norm. Amid and as a result of this environment, female employees who question these norms or raise concerns are routinely pushed out of the Company.

158. Further, BSNC demonstrates a reckless disregard—a deliberate indifference—to discrimination against its female employees by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

159. BSNC's territory/account assignment, quota assignment, sales compensation, promotion, training, evaluation, awards, termination, and complaint policies, practices and procedures have a disparate impact on the Class Representatives and the Class they seek to represent. Such policies, practices and procedures are not valid, job-related or justified by business necessity.

160. Additionally, it is BSNC standard operating procedure to intentionally

discriminate against female sales employees.

161.   Discrimination in compensation occurs as a pattern or practice in BSNC as a result of common policies directing the use of flawed criteria by managers.   Compensation is driven by personal familiarity, subjective decision-making, and interaction between male executives and subordinates rather than by merit and reliable measures of productivity and production.

162.   Moreover, discrimination in selection, promotion and advancement occurs as a pattern or practice in BSNC.   Assignment, selection, promotion and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male executives and subordinates rather than by merit and fair application and interview process.

163.   These polices, practices and procedures all suffer from a lack of transparency, adequate quality standards and controls, sufficient implementation metrics, upper management/HR review and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

164.   BSNC's subjective decision-making is centralized and the product of common policies.

165.   As a result, male employees have advanced and continue to advance more rapidly to better and higher-paying jobs than female employees.

166.   BSNC's policies, practices and procedures have an adverse impact on and have resulted in routine adverse disparate treatment of female employees seeking selection for, or advancement to, better and higher-paying positions.   The higher the level of the job classification, the lower the percentage of female employees holding it.

167.   As a result, male managers have a disproportionate say in the assignment, development, evaluation and compensation of female employees.

Female employees are routinely undervalued and their work product minimized and disregarded, resulting in significant implications not only for their advancement opportunities but also for their compensation.

168.   Because BSNC's personnel management systems do not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of its uniform policies and procedures, female employees suffering from discrimination are without recourse.  In addition, the absence of a check on discrimination extends to retaliatory actions, leaving victims of discrimination doubly vulnerable.   Therefore, BSNC fosters and sometimes even condones discrimination.

169.   BSNC has failed to impose adequate discipline for employees who violate its anti-discrimination policies and equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such policies and laws.

170.   The employment policies, practices and procedures to which the Class Representatives and the Class members are subjected are set at the highest levels and apply universally to all Class members.  These employment policies, practices and procedures are not unique or limited to any district; rather, they apply to all districts and, thus, affect Class Representatives Fretter and Korsgaard and Class members in the same or similar ways regardless of the district in which they work.

171.   Because of BSNC's systemic pattern and practice of gender discrimination, the Class Representatives and Class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits as well as physical and emotional pain and suffering.

172.   The Class Representatives and the Class have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and the Class

are now suffering, and will continue to suffer, irreparable injury from BSNC's ongoing, unlawful policies, practices and procedures as set forth herein unless those policies, practices and procedures are enjoined by this Court.

**B. <u>Efficiency Of Class Prosecution Of Common Claims</u>**

173.   Certification of a class of female employees is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representative and the proposed Class.

174.   The claims of Class Representatives Fretter and Korsgaard require resolution of the common questions concerning whether BSNC has engaged in a systemic pattern and/or practice of gender discrimination against female employees and/or whether its facially neutral policies have an adverse effect on the Class. Class Representatives Fretter and Korsgaard seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions, in the lives, careers and working conditions of the Class members, and to prevent BSNC's continued gender discrimination.

175.   Class Representatives Fretter and Korsgaard have standing to seek such relief because of the adverse effects that such discrimination has had on them individually and on female sales employees generally.  BSNC caused Plaintiffs' injuries through its discriminatory practices, policies and procedures, as well as its disparate treatment of employees who are female. These injuries are redressable through systemic relief, such as injunction, and other appropriate class-wide and individual remedies sought in this action.

176.   In order to gain such relief for themselves, as well as for the Class members, Class Representatives will first establish the existence of systemic gender discrimination at BSNC as the premise for the relief they seek individually.

177.   Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.   Certification of the

proposed class of female sales representatives is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Class, and the Defendant.

### C. Numerosity And Impracticability Of Joinder

178.   The Class that Ms. Fretter and Ms. Korsgaard seek to represent is too numerous to make joinder practicable.  Upon information and belief, the proposed Class consists of at least 200 current and former employees during the liability period.  Defendant's pattern or practice of gender discrimination and disparate impact gender discrimination also makes joinder impracticable by discouraging females from applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of Defendant's class-wide liability.

### D. Common Questions Of Law And Fact

179.   The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their claims and those of the Class they seek to represent.

180.   The common questions of law include, *inter alia*: (a) whether BSNC has engaged in unlawful, systemic gender discrimination in its compensation, promotion, assignment, advancement and discipline policies, practices and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in assignment, development, compensation, promotion, training, evaluation, personnel management, termination, maternity, awards and complaint policies, practices and procedures violates Title VII and/or other statutes; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII and/or other statutes; (d) whether the failure of upper management and HR to prevent, investigate or properly respond to evidence

and complaints of discrimination in the workplace violates Title VII and other statues; (e) whether BSNC is liable for a continuing systemic violation of Title VII, and other statutes; (f) a determination of the proper standards for proving a pattern or practice of discrimination by BSNC against its female sales employees under the disparate treatment theory of liability; and (g) a determination of the proper standard for proving that facially neutral employment practices at BSNC had a disparate impact on the Class.

181.   The common questions of fact include: whether BSNC has, through its policies, practices and procedures: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (b) through the use of that system of assignment placed female employees in job titles or classifications lower than similarly situated male employees; (c) systemically, intentionally or knowingly placed female employees in job titles or classifications lower than similarly situated male employees; (d) used a sales compensation plan that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (e) through the use of that sales compensation plan compensated female employees less than similarly situated male employees in salary and/or other perks; (f) systemically, intentionally or knowingly assigned female employees to less profitable territories or offered lower compensation tiers than similarly situated male employees; (g) systemically, intentionally or knowingly failed to develop or provide opportunities for development to female employees in a commensurate manner to their similarly situated male counterparts; (h) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (i) through the use of that promotion system precluded or delayed the promotion of female employees into higher jobs traditionally held by male employees; (j) systemically, intentionally or knowingly precluded or delayed the

selection and promotion of female employees into higher level jobs traditionally held by male employees; (k) used a system for performance evaluations that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress, and which was often not used at all; (l) fostered a corporate atmosphere that tolerates sexual harassment and otherwise inappropriate verbal and physical behavior towards female employees; (m) used HR systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (n) relying upon and using these systems, minimized, ignored or covered-up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management or the Human Resources department; (o) systematically, intentionally, knowingly or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled or covered up evidence of or complaints of gender discrimination (p) retaliated against those who have complained of gender-based discrimination through techniques including but not limited to disadvantageous territory reassignment, interference with managerial responsibilities, unwarranted disciplinary measures, and increased scrutiny; and (q) otherwise discriminated against women in the Company.

**E. Typicality Of Claims And Relief Sought**

182. The claims of the Class Representatives are typical of the claims of the Class. The relief sought by Class Representatives for gender discrimination complained of herein is also typical of the relief that is sought on behalf of the Class.

183. Like the members of the Class, the Class Representatives are female employees who worked at BSNC during the liability period.

184. Discrimination in assignment, promotion, development, selection,

training, evaluations and HR oversight affects the compensation, advancement and overall treatment of the Class Representatives and all Class members in the same or similar ways.

185.   BSNC has failed to create adequate incentives for its executives and managers to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices and procedures referenced in this Complaint, and has failed to discipline adequately its executives, managers and other employees when they violate Company policy or discrimination laws.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

186.   BSNC has further failed to respond adequately or appropriately to evidence of discrimination and complaints or concerns raised about the same. These failures have affected the Class Representatives and the Class members in the same or similar ways.

187.   The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the Class members in this case.  Class Representatives Fretter and Korsgaard seek the following relief for their individual claims and for those of the members of the proposed Class: (a) a declaratory judgment that BSNC has engaged in systemic gender discrimination against the Class by (1) paying female employees less than their male counterparts, (2) denying female employees promotion into better and higher-paying positions and (3) otherwise failing to prevent, investigate or respond to evidence of discrimination in the workplace; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effectuates a restructuring of BSNC's promotion, training, performance evaluation, compensation and discipline policies, practices, and procedures—so that women at BSNC will be able to compete fairly in the future for promotions, transfers and assignments to better and higher-paying classifications with terms and conditions

of employment traditionally enjoyed by male employees, and so that they may if necessary raise concerns about discrimination without fear of retaliation; (d) back pay, front pay and other equitable remedies necessary to make the employees whole from the Defendant's discrimination; (e) punitive and nominal damages to prevent and deter BSNC from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) pre-and post-judgement interest; and (h) attorneys' fees, costs and expenses.

**F.  <u>Adequacy Of Representation</u>**

188.   The Class Representatives' interests are co-extensive with those of the Class they seek to represent in this case.  The Class Representatives seek to remedy BSNC's discriminatory employment policies, practices and procedures so that female employees will no longer be prevented from advancing into higher-paying and higher ranked positions at BSNC.

189.   Class Representatives Fretter and Korsgaard are willing and able to represent the Class fairly and vigorously as they pursue their claims in this action.

190.   Class Representatives Fretter and Korsgaard have retained counsel who are qualified, experienced and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience and resources of counsel to litigate competently the individual and class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

**G.  <u>Requirements Of Rule 23(b)(2)</u>**

191.   BSNC has acted on grounds generally applicable to the Class Representatives and the Class by adopting and following systemic policies, practices and procedures that are discriminatory.  Gender discrimination is BSNC's standard operating procedure rather than a sporadic occurrence.

192.   BSNC has refused to act on grounds generally applicable to the Class

by, inter alia: (a) failing to pay and promote female employees on par with similarly situated male employees; (b) assigning female employees to job titles and classifications lower than appropriate for their actual job duties and responsibilities; (c) denying female employees promotion and advancement opportunities in favor of male employees; (d) failing to prevent, respond to, adequately investigate and appropriately resolve claims of gender discrimination; and (e) refusing to adopt and apply selection, promotion, training, performance evaluation, compensation, Human Resources, corporate leadership policies, practices and procedures that do not have a disparate impact on, or otherwise systemically discriminate against, female employees.

193. BSNC's policies, practices and procedures of assignment, development, promotion, advancement, compensation, awards and performance evaluations have resulted in gender discrimination and stratification.   BSNC's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the Class as a whole.

194. Injunctive, declaratory and affirmative relief are the predominant forms of relief sought in this case.   Entitlement to declaratory and injunctive relief flows directly and automatically from proof of systemic gender discrimination by BSNC.

195. In turn, entitlement to declaratory and injunctive relief forms the factual and legal predicate for recovery by the Class Representatives and Class members of monetary and nonmonetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

## H. **Requirements Of Rule 23(b)(3)**

196. The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the

common issues previously identified herein, predominate over any issues affecting only individual claims. These common issues include whether BSNC has engaged in gender discrimination against female employees by (a) assigning female employees to lower job titles and classifications than their male counterparts; (b) paying female employees less than their male counterparts by denying them commission and assigning them less profitable territories; (c) denying female employees promotion and advancement opportunities in favor of male employees; and (d) failing to prevent, respond to, investigate adequately or respond appropriately to instances of gender discrimination.

197.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

198.   The cost of proving BSNC's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed Class to prosecute their claims individually.

199.   By virtue of the pattern and practice of discrimination at BSNC, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, compensatory damages, and other nominal and punitive damages.

## COLLECTIVE ACTION ALLEGATIONS
## UNDER THE EQUAL PAY ACT

200.   Plaintiffs Fretter and Korsgaard incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based common policies and practices resulting in unequal pay earned by female sales employees.

201.   Plaintiffs bring collective claims under the Equal Pay Act ("EPA") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Class. The **EPA Class** consists of all

current, former, and future female sales employees in a sales representative role, at the Regional Business Manager level or below, including, without limitation, Territory Manager, Clinical Specialist, and Account Manager, who worked at any time in Defendant's sales organization in the United States during the applicable liability period.

202. Plaintiffs Fretter and Korsgaard seek to represent all of the female sales employees described above. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

203. The EPA class includes female sales employees in the roles described above, who (a) were not compensated equally to males who had substantially similar job classifications, job functions, job families, job codes, job titles, job descriptions, and/or job duties based on Defendant's common employment policies and centralized decision-making; (b) were not compensated equally to males who performed substantially similar work; or (c) who were denied assignment, placement, promotion, and/or advancement opportunities that would have resulted in greater compensation in favor of lesser qualified male employees based on Defendant's common employment policies and centralized decision-making.

204. Questions of law and fact common to the Plaintiffs and the EPA Class include but are not limited to the following: (a) whether Defendant unlawfully failed and continues to fail to compensate female employees at a level commensurate with similarly situated male employees; (b) whether Defendant unlawfully assigned and continues to assign female employees into positions graded at a lower pay and compensation scale to similarly qualified males; (c) whether Defendant's policy and practice of failing to compensate female employees on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and (d) whether Defendant's failure to compensate female employees on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

205.   Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), because the claims of the Plaintiffs are similar to the claims of the EPA Class.

206.   Plaintiffs Fretter, Korsgaard, and the members of the EPA Class (a) are similarly situated; (b) have substantially similar job classifications, functions, titles and/or duties; and (c) are subject to Defendant's common policy and practice of gender discrimination in (i) failing to compensate female employees on par with male employees who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees with job classifications, grades and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning female employees into lower-level positions than male employees who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to male employees who perform substantially equal work.

### NATURE OF NOTICE TO THE PROPOSED CLASSES

207.   Upon conditional certification of the EPA collective action, the Court should authorize notice to members of the proposed EPA Class so that each potential class member can decide whether to opt in to the EPA collective action.

208.   Plaintiffs do not have the contact information of all members of the proposed EPA Class and therefore have no way to apprise them of the opportunity to join this collective action, absent court-authorized notice.

209.   Upon certification under Rule 23 of the Title VII class action, the Court should authorize notice to members of the proposed Title VII Class to provide each class member with an opportunity to opt out of the Title VII Class.

### **COUNT I**

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

## ("TITLE VII"),

## 42 U.S.C. § 2000e, *et seq.*

## Pay Discrimination

## (On Behalf of Plaintiffs Fretter, Korsgaard and All Class Members)

210.   Class Representatives Fretter and Korsgaard re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

211.   This Count is brought on behalf of Class Representatives Fretter and Korsgaard and all members of the Class.

212.   Defendant has discriminated against Class Representatives Fretter and Korsgaard and members of the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

213.   Defendant has discriminated against Class Representatives Fretter and Korsgaard and members of the Class by subjecting them to unequal pay, territory and quota assignments, and rankings that affect pay, in violation of Title VII.

214.   Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the work place.

215.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights Class Representatives Fretter and Korsgaard and members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

216.   Defendant has intentionally discriminated against the Class Representatives and the Class and/or its policies, practices, and/or procedures have

produced a disparate impact on the Class Representatives and the Class with respect to pay and other terms and conditions of their employment.

217.   As a result of Defendant's conduct alleged in this complaint, Class Representatives Fretter and Korsgaard and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

218.   By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the members of the class, the Class Representatives and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

219.   By reason of Defendant's discrimination, Class Representatives Fretter and Korsgaard and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of compensatory and punitive damages.

220.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**("TITLE VII"),**

**42 U.S.C. § 2000e, *et seq.***

**Promotion Discrimination**

**(On Behalf of Plaintiffs Fretter, Korsgaard and All Collective Action**

**Members)**

221.   Class Representatives Fretter and Korsgaard and all members of the Class re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

222.   This Count is brought on behalf of Class Representatives Fretter and

Korsgaard and the Class.

223. Defendant has discriminated against Class Representatives Fretter and Korsgaard and the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender. The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and BSNC's policies, practices and procedures.

224. Defendant has discriminated against Class Representatives the Class by treating them differently from and less preferably than similarly situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities and discriminatory territory and quota assignments that affect promotions in violation of Title VII.

225. Defendant's policies, practices, and/or procedures have produced a disparate impact on the Plaintiffs and the members of the class with respect to the terms and conditions of their employment.

226. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling Class Representatives and the members of the Class to punitive damages.

227. As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

228. By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout the employment of Class Representatives and the class members, Plaintiffs and the class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

229. By reason of Defendant's discrimination, Class Representatives Fretter and Korsgaard and the Class are entitled to all legal and equitable remedies

available for violations of Title VII, including an award of punitive damages.

230.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT III

## VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963

## ("EQUAL PAY ACT"),

## 29 U.S.C. §206(d)

## (On Behalf of On Behalf of Plaintiffs Fretter, Korsgaard and All Class Members)

231.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

232.   This Count is brought on behalf of the Plaintiffs and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

233.   Defendant has discriminated against the Plaintiffs and the EPA Class in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.,* as amended by the Equal Pay Act of 1963 ("EPA"), by providing them with lower pay than similarly-situated male colleagues on the basis of their gender, female, even though Plaintiffs and members of the EPA collective performed similar job duties requiring the same skill, effort, and responsibility of male counterparts, and are or were performed under similar working conditions.

234.   Defendants so discriminated against Plaintiffs and all EPA collective by subjecting them to discriminatory pay policies, including discriminatory territory assignments and quotas, denials of bonuses and other compensation incentives, discriminatory denial of promotions, and other forms of discrimination in violation of the Equal Pay Act.

235.   The differential in pay between males and female employees was not due to seniority, merit, quantity or quality of production, but was due to gender.

236.   Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

237.   The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C § 255(a).   Because Defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

238.   As a result of Defendant's conduct alleged in this complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

239.   By reason of Defendant's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

240.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT IV

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

## 42 U.S.C. § 2000e-5(f), *et seq*.

## Retaliation

## (On Behalf of Plaintiff Fretter)

241.   Plaintiff Fretter re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

242.   Plaintiff Fretter engaged in protected activities by, but not limited to, complaining about gender discrimination including, but not limited to, pay disparities, denial of opportunities for professional advancement, favorable

treatment towards male employees and vocalizing the need for litigation.

243.   Defendant engaged in adverse employment actions against Plaintiff for engaging in protected activities.  Such adverse employment actions have been in the form of subjecting her to unfavorable terms and conditions of employment, including *inter alia*, denials of promotions, disciplinary actions and subjection to a hostile working environment.  The adverse employment actions have materially and adversely affected Plaintiff's overall terms and conditions of employment.

244.   A reasonable employee would find BSNC's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

245.   Defendant's retaliatory acts against Plaintiff Fretter were a direct and proximate result of her protected activities.

246.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff Fretter, entitling her to punitive damages.

247.   As a result of Defendant's conduct alleged in this complaint, Plaintiff Fretter has suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

248.   By reason of Defendant's discrimination, Plaintiff Fretter is entitled to all legal and equitable remedies available, including an award of punitive damages.

249.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT V

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

## 42 U.S.C. § 2000(e) *et. seq.*

### Constructive Discharge

### (On Behalf of Plaintiff Korsgaard)

250.   Plaintiff Korsgaard re-alleges and incorporates by reference each and

every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

251. BSNC has discriminated against Plaintiff by permitting the creation of a discriminatory work environment in violation of Title VII.

252. The discriminatory work environment was so intolerable that Plaintiff had no choice but to resign her employment in June 2012.

253. BSNC's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Korsgaard.

254. As a result of Defendant's conduct alleged in this complaint, Plaintiff Korsgaard has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

255. By reason of Defendant's discrimination, Class Representative Korsgaard is entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

256. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all those similarly situated, pray that this Court:

A. Grant certification of this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and (b)(3), on behalf of the proposed Plaintiff Class; designation of the proposed Class Representatives as representative of this Class; and designation of Plaintiffs' counsel of record as Class Counsel;

B. Designate this action as a collective action on behalf of the proposed EPA Collective Action Plaintiffs and (i) promptly issue notice pursuant to 20 U.S.C. § 216(b) to all similarly situated  members of the EPA Collective Action Opt-In Class, which (a) apprises them of the pendency of this action and (b)

permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and

(ii) toll the statute of limitations on the claims of all members of the EPA Collective Action Opt-In Class from the date the original complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in as Plaintiffs;

C.   Declare and adjudge that the corporate Defendant's employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members;

D.   A permanent injunction against BSNC and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages and gender discrimination as set forth herein;

E.   Order Defendant to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendant's past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

F.   Order Defendant to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner;

G.   Order Defendant to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in D through E above;

H.   Order Defendant to adjust the wage rates and benefits for the Class

Representatives and the Class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures;

I.      Order Defendant to place or restore the Class Representatives and the Class members into those jobs they would now be occupying but for Defendant's discriminatory policies, practices and/or procedures; and/or

J.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and are determined to be in full compliance with the law;

K.      Award nominal, compensatory and punitive damages to the Class Representatives and the Class members, in excess of fifty million dollars;

L.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members;

M.      Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and the Class members to be determined at trial;

N.      Order Defendant to make whole the Class Representatives and Class members by providing them with appropriate lost earnings and benefits, and other affirmative relief;

O.      Award any other appropriate equitable relief to the Class Representatives and Class members; and/or

P.      Award any additional and further relief as this Court may deem just and proper.

///

///

///

///

## **JURY DEMAND**

Plaintiffs Fretter and Korsgaard demand a trial by jury on all issues triable of right by jury.

Dated: March 18, 2015                    SANFORD HEISLER KIMPEL, LLP

By: _____
                                         Felicia Medina
                                         Xinying Valerian
                                         Attorneys for Plaintiffs and the Class